**DISTRICT OF COLUMBIA, Appellant,**

v.

**Mary C. COOPER, Appellee.**

**No. 80–206.**

District of Columbia Court of Appeals.

Argued En Banc Sept. 28, 1981.

Decided May 11, 1982.

Leo N. Gorman, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, David P. Sutton, Deputy Corp. Counsel at the time the case was briefed, and Thomas A. Medford, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellant.

Stephen J. Cribari, Arlington, Va., filed the petition for rehearing en banc, for appellee.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS,* MACK, FERREN, PRYOR and BELSON, Associate Judges.

PRYOR, Associate Judge:

This matter arose out of a personal injury action instituted by appellee, Mary Cooper, against the District of Columbia as the result of a fall she sustained on a walkway located within the confines of the Lorton Reformatory. A jury trial was had at which appellee posited that her fall and resultant injuries were proximately caused by the District's negligent failure to maintain the walkway in a reasonably safe condition. Following the denial of the District's motions for a directed verdict at the close of appellee's case, and again at the close of all the evidence, the case was submitted to the jury which returned a verdict of $30,000 in favor of appellee. Judgment was entered in accordance therewith. Appellant's subsequent motion for a judgment *non obstante veredicto* having been denied, this appeal was taken.[1] On appeal, we are presented with one question: whether there was sufficient evidence to support the jury's conclusion that the District of Columbia, by any negligent act or failure to act, proximately caused injury to appellee.[2] We find that the jury verdict is supported by sufficient evidence and therefore affirm.

I

At approximately 7:00 p. m. on March 9, 1977, Mary Cooper and a companion, Frances Fuller, arrived at the Lorton Reformatory for the purpose of visiting an inmate. Having been "processed" at the visitors' trailer, the two women emerged from the trailer onto a brick walkway. The walkway was the only route which led to the visitors' lounge. Cooper testified that she took approximately two steps along the walkway, "left level ground and went to unlevel ground." In doing so, she fell on a portion of the walkway where the bricks had been removed and replaced with material largely composed of dirt, sand, and little rocks.

---

\* Associate Judge HARRIS was a member of the court at the time of en banc argument. He retired on February 5, 1982.

1. This case was initially heard by a division of the court. The opinion which was rendered, *District of Columbia v. Cooper,* (No. 80-206, June 2, 1981), was later vacated and the matter was presented to the full court.

The view has been expressed, in dissent, that the questions presented by this case are not of sufficient importance to warrant the en banc attention of this court. From the vantage point of trial judges and attorneys, however, there is considerable importance in providing a guide, as best we can, to a problem which is recurring, significant to the outcome of many cases, and likely to be the basis for advice which is given to potential litigants. That we appear closely divided on such a fundamental concept does not lessen the need to confront it.

2. Appellant also asserts that assuming arguendo that appellee's evidence was sufficient to establish the existence of a dangerous condition on the Lorton walkway, appellee failed to establish that the District had actual or constructive knowledge of the defect sufficiently in advance of appellee's fall to give the District a reasonable time within which to take proper corrective action. We do not reach the District's notice argument since it is conceded the District had actual knowledge of the defect and took what it perceived as reasonable corrective action.

She landed on her knees striking her forehead on the sand compound. Appellee stated that the portion of the walkway which contained the sand was not equal in height to the level of the brick walkway, but was lower. Although she was not sure of the exact difference in elevation, she was positive that the sand base was lower than the bricks. When asked on cross-examination to give the specific dimensions, Cooper stated that there was a difference of an eighth of an inch in the surface level. Appellee saw no signs warning of the irregularity, nor was she given a verbal warning. Assisted by Fuller and Lieutenant James A. Meyer, a correctional supervisor at Lorton, who observed the fall, appellee got to her feet. At that time she declined Meyer's offer of medical assistance. She decided instead to proceed to the visitors' lounge. Once there, however, dizziness caused her to abbreviate her visit and return to the visitors' trailer. Appellee then attempted to get medical assistance but was informed that she could not be taken to the Reformatory infirmary at that time; she was advised to see her personal physician.

The testimony of Frances Fuller was substantially the same as appellee's. She testified that she almost tripped in the same area. She turned to warn appellee, only to see her fall. She added that no signs were posted, nor was she given any warning by any Lorton employee.

William Dawson, a bricklayer employed at Lorton, testified on behalf of the District. He recalled that in early March 1977, cold weather caused water underneath some of the bricks in the walkway to freeze and buckle in an area approximately four feet wide and six feet long. Dawson was called to repair the walkway but was unable to replace the bricks because the sub-zero temperature would cause the mortar to freeze before the bricks could be reset. As a temporary measure, he filled the area (where the bricks had been removed) with sand which he "tapped down" and leveled with the remaining bricks. He returned once a day to inspect the area and make sure that the sand was level with the adjacent bricks. Dawson testified that, in light of the inclement weather, this was one of the few things that could be done to make the walkway safe. He further testified that on the day of appellee's fall, he inspected the walkway at approximately 2:00 or 3:00 p. m. At that time, the sand was level with surrounding bricks.

Lieutenant James A. Meyer testified that while on duty at the walkway leading from the visitors' trailer to the prison, on March 7, 1977, he observed appellee and Fuller exit from the visitors' trailer at approximately 7:16 p. m. He observed appellee trip and fall, landing on her palms and knees. Meyer testified that he did not see appellee's head strike the ground. Upon witnessing the fall, Meyer rushed to appellee and assisted her to her feet. Once on her feet, she declined the medical treatment which was offered. After the lieutenant obtained the information needed for an accident report, appellee proceeded to the visiting hall. As she walked to the hall, Meyer observed nothing out of the ordinary. The witness also testified that, at the time of the fall, the sand in the area under repair was level with the surrounding bricks. It was illuminated by a light on a twelve foot pole.

Captain Joseph S. Mastin, the shift supervisor, was stationed with Lieutenant Meyer at the entrance to the visitors' lounge. Mastin did not observe appellee fall, nor did he converse with her. He did, however, observe appellee as she rose to her feet and moved to the visiting hall. He noticed nothing unusual as she did so. Mastin was also present when appellee left the institution. He testified that as Cooper was departing, he heard Sergeant Nelson offer her the same medical treatment which Meyer had previously offered. Again she declined. According to Mastin, approximately 150 to 200 people passed through the trailer (and over the walkway) on an average night during visiting hours.

Lastly, Sergeant Harold S. Nelson testified that he processed appellee into Lorton on that particular evening, but did not see her fall. Nelson did see her again at 9:00 p. m. at the close of visiting hours. At that

time, he noticed that appellee was walking with an unusual gait. He made inquiry and upon being told by appellee that she had fallen, Nelson "insisted" that she see the medical technician who was on duty. She declined to do so, stating that her leg felt "all right" and that she would soak it when she got home.

Sergeant Nelson was charged with the responsibility of inspecting the visitors' trailer and gate area for safety and health violations. On the night of the accident, when Nelson came on duty, he noticed that some bricks in the walkway had been taken up and replaced with sand. He testified that the sand was "up to the surface of the remaining bricks and the borders and it was packed." At approximately 9:00 p. m., when visiting hours ended, it was his opinion that the walkway was in the same condition. If the sand was not level with the surrounding bricks, it would have been Nelson's responsibility to report that or prevent visitors from entering the institution until the walkway was properly repaired. Nelson estimated that 200 people were processed between 5:00 p. m. and 9:00 p. m. on March 9, 1977 at the checkpoint at which appellee was processed, and the same number entered the institution via the walkway on which she fell. The sergeant received no other accident report concerning the walkway during that time.

## II

■ We start with the premise that the District is not an insurer of the safety of those who utilize its streets and sidewalks. It is, however, required to maintain the same in a reasonably safe condition. *Washington Gas Light Co. v. Jones*, D.C. App., 332 A.2d 358, 361 (1975); *District of Columbia v. Williams*, D.C.Mun.App., 46 A.2d 111, 112 (1946). The question of whether a walkway is reasonably safe is generally one for the jury. Only in extreme instances where no reasonable person

could reach a verdict in favor of the plaintiff on the evidence presented, should a directed verdict be granted, *Proctor v. District of Columbia*, D.C.App., 273 A.2d 656, 659 (1971), and only in such cases is a judgment *non obstante veredicto* proper.[3] For, jurors are the triers of fact and where there is evidence upon which reasonable persons might differ as to negligence and other elements of liability, those questions must be decided by the jury. *Id.; Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944).

■ The plaintiff has the burden of establishing that a violation of the reasonable standard of care is the proximate cause of the injury sustained. The mere happening of an accident does not meet this burden. *See Jones v. Safeway Stores, Inc.*, D.C.App., 314 A.2d 459, 460 (1974). There must be evidence of the violation and injuries proximately caused thereby. However, "the law does not require proof of negligence to a certainty. Rather, the law requires only that the evidence, when viewed most favorably for the plaintiff, indicate a reasonable probability of negligence on the part of the defendant." *Rich v. District of Columbia*, D.C.App., 410 A.2d 528, 532 (1979) (citation omitted).

■ Viewing the evidence in the light most favorable to appellee, *id.*, we find sufficient evidence on this record from which a reasonable person could conclude that the District failed to maintain the walkway in a reasonably safe condition and that its failure to do so proximately caused appellee's injuries.

Relying primarily on *Proctor v. District of Columbia, supra*, appellant argues that appellee's evidence was insufficient to go to the jury. In *Proctor*, the plaintiff, while en route home from a neighborhood store at about 10:00 p. m., stubbed her toe on what she described as a "protruding brick" in a brick sidewalk, and fell to the ground, fracturing her arm. By measuring the distance

---

**3.** Indeed, "[i]t must be kept in mind that it is the unusual case in which only one conclusion reasonably could be drawn from the evidence, and in which negligence, contributory negli-

gence, and proximate cause will not be questions of fact for the jury." *Rich v. District of Columbia*, D.C.App., 410 A.2d 528, 532 (1979).

between the two fingers which plaintiff held up to depict the difference in the elevation of brick over which she tripped and the surrounding bricks, the trial court determined that there was a one-quarter inch difference. On those facts this court examined whether there was sufficient evidence to raise a factual question to be presented to the jury. Inasmuch as the only evidence of negligence offered by the plaintiff was a brick protruding one-quarter of an inch, we agreed with the trial judge that "no reasonable men [could] differ regarding the condition of the surface at the point where plaintiff said she tripped and fell." *Id.* at 658 (footnote omitted). Thus, taking into consideration the frequency with which pedestrians in urban areas witness minor elevations in the sidewalks, the plaintiff's failure to offer evidence of negligence other than the height of the protruding brick, and the minor nature of that protrusion, we affirmed the trial court's decision, concluding as a matter of law that the evidence could not support a finding of negligence.

Appellant argues by analogy that in this case, the one-eighth inch[4] irregularity was likewise so trivial that a directed verdict or judgment *non obstante veredicto* should have been granted. We are not persuaded by this argument since, in the instant case, the evidence of negligence is not a mere minor differential in the elevation of bricks in a brick sidewalk, but an area of known irregularity in a walkway, where the jury reasonably could infer that the temporary walkway area was predominantly sand, where there was no alternate route of travel, where remedial action was under way, without any notice or warning to that effect. Thus, the question which was presented to the jury in this case was multifaceted and therefore dissimilar to the trial court's treatment in *Proctor* of the legal effect of a single protruding brick on a city sidewalk. Given the fact that repair work was under way, which required visitors to walk from the brick walkway to a sand path, with minor elevation change, a reasonable person could find that these conditions, in toto, were sufficient to warrant some warning to the visitors. Absent the same, a reasonable person could find that the District failed to exercise reasonable care and thereby caused appellee's injuries.

Moreover, unlike the *Proctor* case where the height of the protruding brick was not a contested factual issue for the jury to decide, here reasonable persons could differ as to the condition of the walkway when appellee fell. To rebut the appellee's testimony that the level of sand was below the level of brick, the District offered the testimony of Lorton employees who stated that the sand compound was even with the brick walkway before, during, and after visiting hours on the day appellee fell. Testimony was also presented, however, indicating that approximately 200 people had stepped across the sand-filled area, thereby creating some indication that a depression had formed. Thus, the jury was entitled to consider and resolve this contested issue of fact—*i.e.*, the condition of the walkway when appellee fell.

As reasonable people could differ on the record before us, it was not error for the trial court to submit the case to the jury and deny appellant's motion for judgment *non obstante veredicto*.

*Affirmed.*

FERREN, Associate Judge, with whom NEWMAN, Chief Judge, joins, concurring:

I concur fully in Judge PRYOR's opinion for the court but write to emphasize one point.

Central to the thesis of our dissenting colleagues is their understanding of the texture of the temporary walkway. They characterize it as a "compound" or "aggre-

---

4. Although appellee Cooper testified on cross-examination that the difference in surfaces was one-eighth of an inch, this estimated measurement—unlike the description given by the plaintiff in *Proctor*—did not become the focal point of the trial. Indeed the District refused to accept appellee's characterization regarding the condition of the walkway. Rather, the District continually asserted that there was no difference in elevation whatsoever.

gate compound" or "gravel compound," * implying a hard surface that, as a matter of law, cannot manifest negligence. While appellant herself referred to "little rocks" and "gravel and stuff that was in the sand," every one of the government's own witnesses, including the bricklayer and correctional officers, exclusively characterized it as a 24-square-foot area, brick high, filled with "sand" (although one government witness also referred to "rubbish" there). Thus, the testimony taken as a whole is open to a reasonable inference that the area primarily was sand filled and that the surface was soft, given the testimony of government witnesses that the area regularly had to be tamped down. It follows that the jury reasonably could find negligence, in that a person who must walk from a brick surface to one primarily filled with sand easily could lose her footing or trip against the brick at the end.

KERN, Associate Judge, dissenting:

In my view the *only* issue raised by this appeal which merits en banc consideration is why in the world all nine judges of this court—confronting on the average a lapse of more than 15 months between the date of the filing of appeals and the date of their disposition [1]—should consider and then decide this case. By no stretch of logic, or even imagination, can it be said that the panel's prior decision (one judge dissenting) involved a question of exceptional importance [2] or was not in conformance with the court's decisions—the only reasons for granting a rehearing en banc under our Rule 40(c).[3]

Apparently, five judges concluded that two judges had reached the wrong conclusion in concluding upon the facts of record that there was insufficient evidence of negligence to permit the case to go to the jury. If this is the stuff of which en banc cases are made, then I shudder for the future of the hapless litigants in our regular cases who must wait while all the members of the court give priority to these en banc cases.[4]

It seems likely that our backlog will be with us for the indefinite future. Hence, taking on unnecessary en banc cases only serves to exacerbate this situation. There have been two in-depth studies of our workload.

A subcommittee of the Judicial Planning Committee supported by consultants from the National Center for State Courts concluded in 1979 that an intermediate appellate court should be established in the District of Columbia—a recommendation estimated to add at least $700,000 annually to the District of Columbia budget. Such an additional financial burden seems now un-

---

* Judge NEBEKER, for example, states with reference to the testimony of Sergeant Harold S. Nelson: "At the beginning of his shift, he had noticed the area filled with the *gravel compound.* He testified that it was 'up to the surface of the remaining bricks and the borders and it was packed.'" *Post* at 661 (emphasis added). Actually, Sergeant Nelson testified as follows: "At that time, I had noticed that the walkway—that bricks had been taken up out of the walkway and *sand* had been replaced up to the surface of the remaining bricks and the borders and it was packed." [Nov. 21, 1979 transcript at 65 (emphasis added).]

1. 1980 Annual Report of District of Columbia Courts, at 35. The 1981 Annual Report, issued as this opinion went to the printer, contained the gloomy news at page 24 that the time is now more than 16 months between notice and decision.

2. I do not mean to denigrate the importance of the case to the parties; but then each and every case coming before us is of vital importance to those involved in that particular case, whether it be heard by a panel or en banc.

3. The petition for rehearing en banc cited *Washington v. District of Columbia*, D.C.App., 429 A.2d 1362 (1981), as the case which "is in direct conflict" with the panel's decision in the instant case. There, we confronted the issue of what constituted a proper notice of a potential claim against the District pursuant to the applicable statute—a question of statutory construction of significance which has troubled the appellate courts in this jurisdiction for a number of years.

The other aspect of that case dealt with the existence *vel non* of proximate cause whereas the instant case concerns the sufficiency of evidence of negligence.

4. District of Columbia Court of Appeals Internal Operating Procedures VII.–I. (1978).

likely to be borne by the District in its present fiscal straits. Also, the prospect of a backlog of yet another court in the District's judicial system seems unlikely to galvanize much citizen support for the creation of such court.

The D.C. Bar's Court Study Committee, the so-called Horsky Committee, deems the 15-month average time for disposition of our appeals as "intolerable" and recommended in 1981 that this court take 24 specific personnel and procedural steps, *e.g.*, more extensive use of senior judges and reducing the size of panels in certain cases. Such recommendations have never been acted upon and have apparently slipped out of any focus. Indeed, the use of the court's four senior judges continues to be severely limited despite the fact that our Internal Operating Procedures I.–F. mandates their use "whenever the business of the court requires."[5]

As one who was not a member of the original panel I voted against rehearing the case en banc and I deem the rehearing to have been improvidently granted. I dissent from the overturning of the panel's decision and I protest the expenditure of scarce judicial resources on a case such as this.

NEBEKER, Associate Judge, with whom BELSON, Associate Judge, joins, dissenting: *

The basis for my dissent appears in the division majority opinion which was vacated before publication. I attach it as an appendix.[1]

The majority properly bases its holding on the premise that the District is not an insurer of the safety of those who utilize its streets and sidewalks, *Washington Gas Light Co. v. Jones*, D.C.App., 332 A.2d 358, 361 (1975) (Harris, J., dissenting), and is not responsible for minor imperfections in its streets and sidewalks. *Proctor v. District of Columbia*, D.C.App., 273 A.2d 656, 659 (1971); *District of Columbia v. Williams*, D.C.Mun.App., 46 A.2d 111, 112 (1946). The majority also correctly states that whether a particular area has been maintained in a reasonably safe condition is generally one for the jury, and only where no reasonable person could reach a verdict in favor of the plaintiff on the evidence presented, should a directed verdict be granted. *Proctor, supra* at 659. It is only in such cases that a judgment *non obstante veredicto* is proper.

It was on exactly such a legal foundation that the division earlier reversed and directed the trial court to enter judgment for the District. The majority of the division held that the evidence disclosed a defect so slight that in the company of all the evidence, as a matter of law, negligence could not be found. It is apparent then that the majority simply desires a different result on the agreed and accepted law. Thus, the majority opinion institutes no major policy shift in the law of negligence from that stated by the division, but rather retains the law and reemphasizes its principles.

Given the court's unanimous determination that *Proctor* is not to be repudiated, I share Judge Kern's dismay over how we consume this court's resources and energy simply to change a result through a "multi-faceted" view of the facts (*ante* at 656). We seem, in practice, to have violated our en banc rule (Rule 40(c))[2] in providing for

---

**5.** A recent news account in the New York Times recounted how senior judges in the Federal Courts—with adequate support staff—"continue to serve on the Federal bench after reaching retirement age . . . using their judicial experience to reduce the heavy workload in the courts." N.Y. Times, Oct. 18, 1981 at 55.

The Horsky Committee recommends this court emulate this practice.

* Associate Judge HARRIS was a member of the original division majority and concurred in this dissent prior to his retirement from the court on February 5, 1982.

**1.** Our specially concurring colleague has belatedly created a new issue—hard or soft surface. Such question has played no part in the case until now.

**2.** D.C.App.R. 40(c) states:
WHEN HEARING OR REHEARING *EN BANC* WILL BE ORDERED. A majority of the judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court *en banc.* Such a hearing or rehearing is not favored and ordinarily will not be ordered except (1) when consideration by the full court is neces-

such rehearing when a majority simply wants a different result from that reached by a division through application of the same law.

Since the en banc majority chose to reemphasize rather than repudiate the *Proctor* rule, I observe that where (unlike here) a genuine issue of material fact exists in a sidewalk injury case of this general type, the jury should be required, under an appropriate instruction, to decide whether the imperfection is so minor as to relieve the District of Columbia of liability. Such an instruction was not in order in the instant case since it was clear as a matter of law that the claimed imperfection was too minor to give rise to liability.

The holding in this case is very narrow. It is limited to a showing of "an area of known irregularity in a walkway, ... where there was no alternate route of travel, where remedial action was under way, without any notice or warning to that effect...." (*Ante* at 656). Why such a case is appropriate grist for our en banc mill escapes me.

### APPENDIX TO DISSENT

NEBEKER, Associate Judge:

This matter arose out of a personal injury action instituted by appellee against the District of Columbia following her fall on a pathway at the Lorton Reformatory. At trial before a jury, appellee posited that her fall and subsequent injuries were proximately caused by the District's negligent failure to maintain the walkway in a reasonably safe condition. Following denial of the District's motion for a directed verdict at the close of appellee's case, and then again at the close of all the evidence, the case was submitted to the jury. A verdict of $30,000 in favor of appellee was returned. Appellant's ensuing motion for judgment *non obstante veredicto* having been denied, this appeal was taken.

We are asked to reverse the judgment of the trial court on one of two grounds. First, appellant asserts that appellee failed to adduce substantial evidence demonstrating that her injuries were proximately caused by any negligent act or failure to act on the part of the District. Secondly, appellant asserts that assuming appellee's evidence was sufficient to establish the existence of a dangerous condition on the Lorton walkway, appellee failed to establish that the District had actual or constructive knowledge of the defect sufficiently in advance of appellee's fall to give the District a reasonable time within which to take corrective action.[1] Finding that no reasonable juror could conclude from the evidence adduced at trial that the District was negligent, we reverse.

The facts are undisputed. At approximately 7:00 p. m. on March 9, 1977, Mary Cooper and a companion, Frances Fuller, arrived at the Lorton Reformatory for the purpose of visiting an inmate. After being admitted to the facility, the two women emerged from the visitors' trailer onto a brick walkway which leads to the visitors' lounge. Cooper testified that she took approximately two steps and then "left level ground and went to unlevel ground." She testified that she fell on a portion of the walkway where the bricks had been replaced by an aggregate compound of packed dirt, sand, and gravel. Cooper landed on her hands and knees, and testified that her forehead hit the ground. Other testimony indicated that the aggregate compound was either level with or one-eighth inch lower than the abutting bricks.

The crucial question in this case is whether there was sufficient evidence of the District's negligence to create a jury issue; stated otherwise, whether no reasonable juror could conclude from the evidence that the District was negligent.

The District is not an insurer of the safety of those on the streets and sidewalks,

---

sary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.

1. There is no merit to the District's notice argument. By admission, the District had actual knowledge of the defect and took what it perceived as reasonable corrective action.

though it is required to maintain the same in reasonably safe condition. *Proctor v. District of Columbia*, D.C.App., 273 A.2d 656, 659 (1971); *District of Columbia v. Williams*, D.C.Mun.App., 46 A.2d 111, 112 (1946).

The question whether a particular area has been maintained in a reasonably safe condition is generally one for the jury. Only in exceptional instances, where no reasonable person could reach a verdict in favor of the plaintiff on the evidence presented, should a directed verdict be granted, *Proctor, supra* at 659, and only in such cases is a judgment *non obstante veredicto* proper.

Jurors are the triers of fact, and where there is any evidence upon which a jury can properly proceed to reach a verdict for the plaintiff, the question must be left to the jury. *Id.* at 659; *Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944).

> This does not imply that all cases must go to the jury, of course. The trial judge, while avoiding broad rules of thumb, must examine the specific evidence in each case and determine whether the jury could reasonably find negligence. [*Klein v. District of Columbia*, 133 U.S.App.D.C. 129, 132, 409 F.2d 164, 167 (1969).]

Bearing this essential framework in mind, a judgment notwithstanding the verdict will be warranted where no reasonable juror could conclude from the facts presented that the defendant was negligent. A "mere scintilla of evidence" will not be sufficient to permit a verdict to stand. *American Marietta Co. v. Griffin*, D.C.App., 203 A.2d 710, 711 (1964). As explained in *Shewmaker, supra*:

> The rule applicable in the District of Columbia on a motion for a directed verdict [and on a motion for a judgment notwithstanding the verdict], in an action founded upon negligence, is that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom; if upon the evidence, so considered, reasonable men might dif-fer, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted; a mere scintilla of evidence is not sufficient; the question is not whether there is any evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party upon whom the *onus* of proof is imposed; the burden being upon the plaintiff to establish the negligence and injury alleged, if the evidence fails adequately to support either element the motion should be granted. [*Id.* at 103, 143 F.2d at 143 (footnote omitted).]

Adopting this approach, supported time and again by decisions of this court, we avoid broad rules of thumb and instead look to the specific evidence of negligence on the record.

Because the determination of reasonable care depends on many factual circumstances, courts may not establish rules denying the jury its traditional function of determining negligence. *Klein, supra* at 132, 409 F.2d 167; *see, e.g., Turner v. District of Columbia*, D.C.Mun.App., 144 A.2d 699 (1958); *Williams, supra*. "The key must remain 'negligence.' Without it there cannot be liability." *Washington Gas Light Co. v. Jones*, D.C.App., 332 A.2d 358, 362 (1975) (Harris, J., dissenting).

We are not persuaded that *Proctor* stands for the proposition that a one-quarter inch depression, rise, or inconsistency in pedestrian pathways is, as a matter of law, a reasonably safe condition as regards the District's maintenance responsibilities. In *Proctor*, the court stated:

> We do not believe that we should get into the position of arbitrarily determining that the maintenance of a particular defect such as a hole of a certain depth or a raised brick protruding a certain height above the surrounding bricks constitutes negligence.... [*Id.* at 658–59.]

Rather, we agree with appellee that *Proctor* held only that evidence of a brick protruding one-quarter inch, alone, did not demonstrate negligence on the part of the Dis-

trict. *Proctor* explicitly declined to establish an arbitrary negligence determinant in the height or depth of defects in city sidewalks. *Id.* We are also not disposed to establish such a determinant, and thus we look to the full panorama of evidence in the case at bar.

Appellee testified that her companion the evening of the accident left the trailer first, three or four steps in front of her. As appellee emerged from the trailer, according to her testimony, she saw that some of the bricks in the walkway had been taken up. She took one or two steps down from the trailer onto the walkway, and then she took two more steps along the part of the walkway where the bricks remained. She testified that she then fell upon the portion of the walkway where the bricks had been replaced with the aggregate material. She testified that the portion of the walkway filled by the gravel was "lower" than the portion of the walkway where the bricks remained. Appellee estimated that the gravel portion of the walkway was "[a]bout an eighth of an inch" lower than the bricks, though she was not sure of the exact difference in elevation.

Appellee's companion testified that she almost tripped over the same area. She turned, however, to warn appellee, only to see her fall, "[h]er head hitting the cement." The companion testified that no signs were posted, nor was she given any warning by any Lorton employee.

A bricklayer testified on behalf of the District that he had performed repair work on the walkway a few days before and had inspected it that very afternoon. He testified that he checked the compound's level daily, and if the area needed additional sand, he added it "and tamped it down and kept it with the level of the bricks."

A correctional supervisor, James A. Meyer, testified that he observed appellee trip and fall on the walkway. He agreed that she put out her hands as she fell, hitting the ground on both her hands and knees; but he indicated that appellee did not strike her head. According to his testimony, the gravel area of the walkway where appellee fell was level with the brick.

Sergeant Harold S. Nelson also testified on behalf of the District. On the day in question, he was assigned to the visiting checkpoint. His responsibilities included inspection of the area for "safety and health violations." At the beginning of his shift, he had noticed the area filled with the gravel compound. He testified that it was "up to the surface of the remaining bricks and the borders and it was packed." Further, he testified that the walkway was in this same condition almost two hours after appellee's fall.

Accepting appellee's contention that the "depressed" area was an eighth of an inch below the abutting bricks, we do not see how a reasonable juror could conclude that the condition of the walkway constituted negligence on the part of the District. Appellee, nevertheless, argues that the condition of the repair area *in toto* constitutes negligence. She points to the size of the repair area (4' by 6'), the change in lighting, and the variety in walkway surface to support her claim.

But this is a case involving such a slight variation in depth or height that it must be said that reasonable persons would not differ. *See Proctor, supra* at 659. The change in lighting and walking surface which appellee alleges as significant are due to her emerging from the light of a trailer and a flat floor to the artificial light thrown by the electric lamp upon the brick pathway. These conditions are hardly attributable to negligent repair of the walkway, nor are they so apparently dangerous as to require warning. In fact, appellee admitted that she saw the repair area in the walkway before descending onto it. The mere happening of an accident does not impose liability or reveal proof of negligence. *See District of Columbia v. Davis*, D.C.App., 386 A.2d 1195, 1200 (1978), and cases cited there.

In sum, testimony indicated that the District had taken every precaution in its repair of the brick walkway. Further, the bricklayer checked daily for variations and repaired them when they became apparent.

When viewed in the light most favorable to appellee, the evidence here discloses a defect so slight that in the company of all the evidence, as a matter of law, negligence cannot be found. The case is remanded and the trial judge is directed to enter judgment for appellant.

*Reversed.*

BELSON, Associate Judge, with whom NEBEKER, Associate Judge, joins, dissenting:

I join in Judge Nebeker's dissent, and also share Judge Kern's puzzlement over why this case was reheard en banc. It seems to me that the proper course for the court at this time is not to issue its ruling en banc, but rather to issue an order stating that rehearing en banc was granted improvidently. This is so not only because such reconsideration cannot be justified under the provisions of our Rule 40(c), but also because the decision of the majority of the original division was demonstrably correct.

I will not belabor the points made in Judge Nebeker's dissent or in the original division's majority opinion appended thereto. However, a few additional points might assist in demonstrating that the majority opinion fails to explicate any basis for upholding the jury verdict in favor of appellee. As will be shown, there was not sufficient evidence of negligence to warrant placing the case before the jury.

We deal here with a temporary sidewalk, in area approximately four feet wide and six feet long, which was replacing the usual brick surface in that area until warmer weather would permit resurfacing with brick. The temporary portion of the sidewalk was, according to plaintiff/appellee, made of a compound of dirt, sand and little rocks. Witnesses for the defendant/appellant testified to placing sand in the walkway, but they were not asked to specify whether the sand was coarse or fine. The record contains no evidence to the effect that the material was loose or its surface so coarse as to cause a pedestrian such as plaintiff/appellee to lose her footing. While appellee testified that she "left level ground and went to unlevel ground" there was no evidence tending to show that the temporary sidewalk surface was "unlevel" in any respect other than that it was, according to appellee, one-eighth of an inch lower than the surface of the brick sidewalk of which it was a part. There was no evidence that its use by other visitors on the day of appellee's fall had rendered the surface unsafe. The fact that appellant took the precaution of having the temporary portion of the sidewalk inspected once every day, and would retamp the surface whenever it was necessary, does not at all show that the temporary portion of the sidewalk was uneven or unsafe at the time of appellee's fall. Indeed, the sidewalk had been inspected earlier the same day, according to one of appellant's witnesses, and found in good order. No evidence produced by appellee suggested to the contrary.

What then is the evidentiary basis upon which the en banc majority would permit the verdict for appellee to stand? Preparatory to identifying that basis, the majority opinion distinguishes *Proctor v. District of Columbia*, D.C.App., 273 A.2d 656, 659 (1971), where it was held that evidence of negligence was insufficient to go to a jury when it established only that one brick protruded a quarter of an inch above the surface of a brick sidewalk. The en banc majority then states:

> [I]n the instant case, the evidence of negligence is not a mere minor differential in the elevation of bricks in a brick sidewalk, but an area of known irregularity in a walkway, where the jury reasonably could infer that the temporary walkway area was predominantly sand, where there was no alternate route of travel, where remedial action was under way, without any notice or warning to that effect. [*Ante* at 656.]

In analyzing the majority's reasoning, it is important to remember that the area of "known irregularity" in the instant case was itself a temporary sidewalk, made, according to plaintiff, of a combination of sand, little rocks and dirt, which had not itself been shown to be at all unsafe or

defective for walking. The "remedial action" which was underway, was not a short-term attempt to repair any defect in the temporary sidewalk, but rather was the longer-term effort to replace the temporary sidewalk with a permanent brick sidewalk when warmer weather came. There was no showing of anything defective or unsafe about the temporary sidewalk which needed to be remedied. Thus, there was no showing of a need for a notice or warning.

The majority goes on to state "Given the fact that repair work was under way, which required visitors to walk from the brick walkway to a sand path, with minor elevation change, a reasonable person could find that these conditions, in toto, were sufficient to warrant some warning to the visitors." *Ante* at 656. Passing by the fact that the temporary portion of the sidewalk cannot fairly be referred to as a "sand path," we must once more ask what appellee had shown that warranted a warning. Was it that a brick sidewalk led onto a composition sand, rock and dirt sidewalk? Certainly that cannot be the case, since it is a common practice on public space in the Washington Metropolitan area to have brick or other hard surface walkways adjoin walks made of compounds including rock or dirt.[1] No signs mark such places, and none are needed.

The only other evidentiary basis that the majority opinion refers to in support of its conclusion that a verdict for appellee was justified by the evidence comes near the end of its opinion where it notes that although District employees testified that the temporary sidewalk was "even with the brick walkway before, during, and after visiting hours on the day appellee fell," *ante* at 656, there was other testimony that indicated that "approximately 200 people had stepped across the sand-filled area, thereby creating some indication that *a depression had formed*." *Ante* at 656 (emphasis supplied). No testimony by any witness who saw the temporary sidewalk at or about the time of appellee's fall

supports the suggestion that "a depression had formed." This supposition is at odds even with appellee's modest assertion of a one-eighth inch variation.

Thus it is clear that the majority opinion fails to identify record evidence upon which a reasonable person could conclude that the District had failed to maintain the walkway in a reasonably safe condition and that its failure to do so proximately caused appellee's injuries. The circumstances brought out at trial, considered in the light most favorable to the appellee, fail to show that there was any condition in existence at the time of appellee's fall about which appellant was obliged to warn pedestrians. Thus, there was no negligence in failing to warn. Unfortunately, the fact is that persons often fall in the absence of negligence on anyone's part. So far as the evidence of record shows, that is what happened here.

I respectfully dissent.

---

1. The answer is the same if the jury concluded that, contrary to plaintiff's/appellee's testimony, the temporary sidewalk was made entirely

of sand, for there was no evidence as to whether any sand used was fine or coarse or whether it was loose or cohesive in consistency.