**McNEIL PHARMACEUTICAL,**
**Appellant/Cross–Appellee,**

v.

**Delores HAWKINS, Appellee/Cross–**
**Appellant.**

**Nos. 94–CV–1346, 94–CV–1396.**

District of Columbia Court of Appeals.

Argued Nov. 28, 1995.

Decided Dec. 23, 1996.

---

8. For one thing, the LOC did not itself require tender of the original LOC.

Richard A. Dean, Washington, DC, with whom Theodore B. Van Itallie, Jr. was on the brief, for appellant/cross-appellee.

David T. Smorodin, with whom Allen T. Eaton, Washington, DC, and Frank M. McClellan, Philadelphia, PA, were on the brief, for appellee/cross-appellant.

Bruce N. Kuhlik, Jennifer A. Johnson and Marjorie E. Powell, Washington, DC, filed a brief on behalf of Pharmaceutical Research and Manufacturers of America as amicus curiae.

Before WAGNER, Chief Judge, and STEADMAN and KING, Associate Judges.

KING, Associate Judge:

Three months after first ingesting a drug prescribed for muscle stiffness, Elva Mae Gilliam suffered severe liver failure and died. This is an appeal in a products liability action filed by Delores Hawkins on behalf of the estate of Gilliam against McNeil Pharmaceutical ("McNeil") alleging that its drug product, Parafon Forte DSC (containing the drug generically known as chlorzoxazone), caused the liver failure and death of Gilliam, Delores Hawkins's mother. A jury awarded Gilliam's estate $1.5 million in compensatory and $2.5 million in punitive damages. McNeil appeals the judgment against it arguing that it is entitled to a reversal of the trial court order denying its motion for judgment as a matter of law, or in the alternative, a new trial, and contending that there was insufficient evidence to allow Hawkins's claims to be submitted to the jury. In her cross-appeal, Hawkins contends that the trial court erred in excluding, in the punitive damages phase, evidence concerning two of McNeil's other drug products and in instructing the jury that punitive damages must bear a reasonable relationship to actual damages. We reverse in McNeil's appeal and remand with instructions to enter judgment for McNeil. We dismiss Hawkins's cross-appeal as moot.

## I. Background

In March of 1990, Mrs. Gilliam consulted Dr. Arthur Burgerman for treatment for numbness and stiffness in her hands. Dr. Burgerman prescribed Gilliam Parafon Forte DSC, a skeletal muscle relaxant containing chlorzoxazone.[1] Approximately three months later, on June 9, 1990, Gilliam died from liver failure.

In July of 1991, Hawkins filed this action against McNeil, the manufacturer of Parafon Forte DSC.[2] Hawkins claimed, *inter alia*, that McNeil was negligent *per se*, based on violations of a federal criminal statute prohibiting false statements to the government, and numerous provisions of the Food Drug & Cosmetics Act ("FD & C Act") and Food and Drug Administration ("FDA") regulations. Hawkins also sought recovery based on strict product liability for McNeil's failure to adequately warn of chlorzoxazone's dangers.

After a month-long trial, the case was submitted to the jury on a special verdict form containing two liability questions and a punitive damages question. On June 24, 1993, the jury returned its verdict against McNeil. According to the special verdict form, the jury found liability by a preponderance of the evidence on both liability questions: (1) that "defendant McNeil Pharmaceutical was negligent in that it failed to give proper warning as to the effect or activities of Parafon Forte DSC and that such negligence proximately caused Elva Mae Gilliam's death," ("negligence *per se* " claim), and (2) that "defendant McNeil Pharmaceutical marketed its drug, Parafon Forte DSC and that said drug was unreasonably dangerous, without proper and adequate warnings and misleading labeling and thereby proximately caused Elva Mae Gilliam's death," ("strict liability" claim). The jury also awarded punitive damages, finding by clear and convincing evidence that "McNeil, through its officers, agents or employees acted or failed to act willfully or out of a reckless disregard for the rights of individuals in Elva Mae Gilliam's situation."[3]

---

1. Chlorzoxazone is a skeletal muscle relaxant that has been marketed by McNeil Pharmaceutical since 1958 under the names Paraflex, Parafon, Parafon Forte, and Parafon Forte DSC. At trial there were references to various versions of the drug; we will refer to the drug simply as "chlorzoxazone" or Parafon Forte DSC.

2. Hawkins also named Dr. Arthur Burgerman, the Yater Medical Clinic, and other physicians who worked at the Yater Medical Clinic; however all those claims were dismissed by the trial court, and no appeal from those dismissals was filed.

3. The trial occurred before our decision in *Woodner v. Breeden*, 665 A.2d 929 (D.C.1995), which imposed the clear and convincing standard for punitive damages in all cases. The clear and convincing standard was applied here, without objection from Hawkins, apparently on the authority of *Raynor v. Richardson–Merrell, Inc.*, 643

After the verdict was returned, McNeil filed a renewed motion for judgment as a matter of law, or, in the alternative, for a new trial. *See* D.C.Super. Ct. Civ. R. 50(b) (1995). Hawkins filed a motion for a new trial limited to the issue of punitive damages. The trial court denied each of the motions, and these appeals followed.

In its appeal, McNeil principally contends that the trial court erred in not entering judgment as a matter of law in its favor on both the negligence *per se* and the strict liability theories.[4] Specifically, McNeil argues that the only theory of negligence that was presented was one of *per se* negligence, which was not supported by the evidence because: (1) the statutes were not appropriate for that purpose; (2) Hawkins did not establish that the statutes were violated; and (3) there was no evidence of proximate causation, because the prescribing physician did not read or rely upon the package insert and did not testify as to how he would have proceeded had he read the insert's warnings. Because the strict liability claim was also based on the alleged violation of statutes and regulations, McNeil contends that the court also erred in denying its motion for judgment as a matter of law on that claim for essentially the same reasons.

## II. The trial

### A. Hawkins's evidence

Hawkins's theory at trial was that McNeil withheld from the medical community in general, and Dr. Burgerman in particular, true and accurate information about chlorzoxazone's relation to liver damage. In particular, Hawkins claimed that McNeil inadequately labeled its chlorzoxazone-containing

products, including Parafon Forte DSC, from 1958 through 1990. As a basis for her negligence *per se* claim, Hawkins relied on numerous federal statutes and regulations, which she claimed had been violated. To establish that McNeil was untruthful in its labeling of chlorzoxazone, Hawkins placed considerable emphasis on three clinical studies conducted during chlorzoxazone's trial stage of development. In order to set the context of the issues that have been presented, we will review in some detail the labeling information for chlorzoxazone, the clinical studies on the drug's effect on the liver, the statutes and regulations submitted to the jury, and the testimony of Hawkins's and McNeil's witnesses at trial.

### 1. *Labeling*

As required by federal law, Parafon Forte DSC was distributed with an FDA-approved label, which sets forth various categories of information about the drug, including its indications, contraindications, warnings, precautions, and adverse reactions. Parafon Forte DSC's 1987 FDA-approved label, which was substantially the same for all of McNeil's chlorzoxazone-containing products, warned of the following:

**WARNINGS**

The concomitant use of alcohol or other central nervous system depressants may have an additive effect.

**PRECAUTIONS**

PARAFON FORTE DSC chlorzoxazone should be used with caution in patients with known allergies or with a history of allergic reactions to drugs. If a sensitivity reaction occurs such as urticaria, redness,

F.Supp. 238, 245 (D.D.C.1986) (elements justifying punitive damages in D.C. must be "clearly established," which in the context of product liability actions, is equated with the clear and convincing standard of proof).

4. In the alternative, McNeil requests a new trial on all issues, contending that the trial court committed various errors, including: submitting the negligence *per se* claim to the jury through the wholesale submission of statutory and regulatory provisions; the giving of certain specified instructions; allowing testimony of a pharmacist regarding the incidence rate of liver injuries to

chlorzoxazone; and submitting the punitive damages claim to the jury.

In her cross-appeal, Hawkins urges the court to grant her a new trial on punitive damages, claiming that the trial court erred in excluding evidence relating to two of McNeil's other drug products and in instructing the jury that punitive damages must bear a reasonable relationship to actual damages. Because we conclude that the trial court erred in not requiring expert testimony concerning the meaning of the statutes, and that reversal is required on that ground, we do not reach any of the other contentions raised.

or itching of the skin, the drug should be stopped.

If any symptoms suggestive of liver dysfunction are observed, the drug should be discontinued.

## ADVERSE REACTIONS

After more than twenty-six years of extensive clinical use of chlorzoxazone-containing products in an estimated thirty-two million patients, it is apparent that the drug is well tolerated and seldom produces undesirable side effects. Occasional patients may develop gastrointestinal disturbances. It is possible in rare instances that chlorzoxazone may have been associated with gastrointestinal bleeding. Drowsiness, dizziness, lightheadedness, malaise, or over-stimulation may be noted by an occasional patient. Rarely, allergic-type skin rashes, petechiae, or ecchymoses may develop during treatment. Angioneurotic edema or anaphylactic reactions are extremely rare. There is no evidence that the drug will cause renal damage. Rarely, a patient may note discoloration of the urine resulting from a phenolic metabolite of chlorzoxazone. This finding is of no known clinical significance.

Approximately thirty-six patients have been reported in whom the administration of chlorzoxazone-containing products was suspected as being the cause of liver damage. In one case, the jaundice was subsequently considered to be due to a carcinoma of the head of the pancreas rather than to the drug. In a second case, there was no jaundice but an elevated alkaline phosphatase and BSP retention. In this patient there was a malignancy with bony and liver metastases. The role of the drug was difficult to determine. A third and fourth case had cholelithiasis. Diagnosis in a fifth case was submassive hepatic necrosis possibly due to abusive use of the drug for approximately one year. The remaining cases had a clinical picture compatible with either a viral hepatitis or a drug-induced hepatitis. In all these latter cases, the drug was stopped, and with one exception, the patients recovered. It is not possible to state that the hepatitis in these patients was or was not drug-induced.

2. *Clinical investigations*
a. **Dr. Arthur L. Drew**

In the mid–1950s, Dr. Arthur L. Drew, Associate Professor of Neurology at the Indiana University Medical Center, began a clinical study assessing the effect of chlorzoxazone on the liver. In September of 1956, Dr. Drew informed a McNeil representative of preliminary results of his study. Dr. Drew reported that after administering chlorzoxazone to fifteen patients who suffered from severe cerebral palsy, fourteen developed a numerical increase in liver function tests: an elevation of cephalin-cholesterol flocculation [5] and a positive test for bilirubin [6] in the urine. Two months later, Dr. Drew reported that nine patients remained in the study, and after all were taken off chlorzoxazone for one week, four of the five patients who had notably elevated cephalin cholesterol flocculation had returned to normal. After all nine patients were again administered chlorzoxazone, seven of the nine patients developed an elevation of cephalin cholesterol flocculation within three to four weeks.[7]

In January of 1957, Dr. Drew submitted his completed clinical study and accompanying drug therapy records to McNeil. In a letter accompanying his records, Dr. Drew noted that he experienced difficulty in obtaining systematic tests from the laboratory he was using for his study. Dr. Drew concluded that he was "inclined to feel that the liver abnormalities in most cases [were] both in-

---

**5.** At trial Hawkins elicited testimony that the *increase in cephalin cholesterol flocculation was* important because it is a serious condition indicating, among other things, abnormality in the liver cell.

**6.** There was later testimony that bilirubin should not be present in the urine under normal circumstances.

**7.** Dr. Drew reported that there were no other *signs or symptoms of illness and no evidence of* jaundice in any patient. He also reported that all other laboratory studies, including the thymol turbidity, total proteins, serum bilirubin, and icteric index, remained within normal limits.

significant and coincidental" and that "carefully controlled checks will fail to show any real evidence of liver damage."

In its original New Drug Application ("NDA") for chlorzoxazone, filed with the FDA in November 1957, McNeil submitted the drug therapy records for Dr. Drew's remaining nine patients, and indicated that "[i]n the series reported by Doctor Drew, there were nine patients with no side effects. One individual complained of headache and nausea while receiving the drug."

### b. Dr. Robert C. Batterman

After receiving Dr. Drew's reports, McNeil asked Dr. Robert C. Batterman to conduct a study of the potential effect of chlorzoxazone on the liver. Dr. Batterman's study included sixteen patients and three tests of liver function: thymol turbidity; cephalin cholesterol flocculation; and serum bilirubin. Of the thirteen patients who continued to receive medication, Dr. Batterman reported results in "three [patients with] possible abnormal readings" of liver function.[8] However, he reported possible alternative causes of the abnormal readings in all three patients.

All of Dr. Batterman's charts and clinical investigative reports, which indicated that twelve of thirteen patients showed some degree of increase in liver function, were submitted by McNeil to the FDA. Dr. Batterman's study concluded that chlorzoxazone "in dosages of 250 mg. 3 times daily for as long as 2 months of continuous therapy has no specific effect upon liver function." In its NDA, McNeil reported that Dr. Batterman's studies indicated that chlorzoxazone had "no specific effect upon the liver function."

8. Two of Dr. Batterman's patients were "control" patients, who did not receive chlorzoxazone. One of the fourteen patients receiving the drug discontinued medication after five days because of an "allergic reaction all over the body." While there was some indication at trial that two of Dr. Batterman's patients had withdrawn from the study, the drug therapy charts indicate that while another patient did have an allergic reaction, the therapy was not discontinued.

9. Hepatoxicity is defined as the "quality or property of exerting a destructive or poisonous effect upon liver cells." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (26th ed.1981).

### c. Dr. William P. Peak

Dr. Peak, a clinical investigator funded by McNeil and former Fellow of the National Institute of Arthritis and Metabolic Diseases, in conjunction with Dr. Richard T. Smith, Director of the Department of Rheumatology and the Benjamin Franklin Clinic in Philadelphia, began a clinical trial in 1956 to compare the effects of chlorzoxazone with a related drug, zoxazolamine. Dr. Peak utilized the cephalin cholesterol flocculation test.

In a hand-written letter dated June 13, 1958, Dr. Peak reported to McNeil that one of his patients had a positive liver function test after taking chlorzoxazone. Thereafter, in June of 1960, Drs. Peak and Smith published an article based on their study in the Pennsylvania Medical Journal that stated that no patients using chlorzoxazone were found to have any type or incidence of hepatoxicity[9]. Hawkins introduced evidence that McNeil knew of Dr. Peak's letter, and nonetheless used the article in its advertising and labeling of its chlorzoxazone products.

### 3. Statutes and regulations

At trial Hawkins contended that McNeil had violated numerous federal statutes and regulations. Over McNeil's objections, the trial court took judicial notice and provided the jury copies of the following federal statutes and regulations: 15 U.S.C. §§ 51–57 (1993 Supp.) (false advertisements); 18 U.S.C. § 1001 (1959) (prohibiting false statements to the government);[10] 21 U.S.C. § 331 (1965) (prohibiting adulteration or misbranding of drugs); 21 U.S.C. § 352 (1989) (false or misleading label renders drug misbrand-

10. 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be [in violation of this statute]. 18 U.S.C. § 1001.

ed);[11] 21 U.S.C. § 355(b)(1) (1953) (new drug applications must include full reports of drug safety investigations); 21 C.F.R. §§ 130.30 (prohibiting "untrue statement" of material fact in new drug application) & 130.35 (1983)[12]; 21 C.F.R. Pt. 201 (1985) (form and content of prescription drug advertising); 21 C.F.R. § 202.1 (1985) (content of prescription drug advertising); 21 C.F.R. §§ 310.302 and 310.303 (1993) (long-term studies, records and reports on new drugs); 21 C.F.R. § 314.8 (1983) (supplemental applications for new drugs); 21 C.F.R. § 314.12 (1985) (untrue statements in new drug application).[13] The trial court provided the jury the full text of the statutes, which contained over sixty-seven pages, copied so that some or all of the text of several other sections of the regulations, the relevance or admissibility of which had never been determined, were also included and therefore available to the jury.[14] Moreover, some of the copies of statutes included case annotations following each provision.[15]

McNeil objected to the use and submission of these statutes numerous times throughout the trial. In particular, on the opening day of trial, McNeil made a "continuing objection" to Hawkins' intention to "invok[e] a federal statute as defining the standard of care." During the testimony, McNeil reiterated its objection several times, stating that it "had no objection to the court taking judicial notice of anything it wanted to take judicial notice of, but we denied the relevance and we object to their admission of exhibits into evidence and objected that they be shown to the jury." McNeil's counsel also stated: "Just so my objection is clear, I object to them coming into evidence at all, and I specifically object to these statutes and regulations being submitted to the jury."

### 4. Testimony

#### a. Expert testimony

Hawkins presented numerous witnesses, qualified as experts in various fields of medicine, to support her case. Dr. Patrick Joseph Dean, a physician at the Department of Pathology of the Baptist Memorial Hospital in Memphis, Tennessee, and board certified in pathology, was accepted as an expert in the field of anatomic and clinical pathology and gastrointestinal pathology. Dr. Dean opined that, based on his review of slides and medical records, Gilliam died of acute liver failure, which was caused by massive death of liver cells. While he further opined that the massive death of liver cells was caused by chlorzoxazone, Dr. Dean conceded that it is difficult, if not impossible, to distinguish drug injury from viral injury simply by looking at slides of a damaged liver.

Dr. John Golombos, a professor emeritus of medicine at Emory University and a consultant in hepatology, who was accepted as an expert in diseases of the liver, opined that to a reasonable degree of medical certainty Gilliam suffered liver failure due to hepatitis induced by chlorzoxazone. Sustaining McNeil's objection to questions, the court did not allow Dr. Golombos to opine whether, based on his review of Dr. Drew's study,

---

11. 21 U.S.C. § 352 provides:

 A drug or device shall be deemed to be misbranded—
 (a) False or misleading label
 If its labeling is false or misleading in any particular.

12. 21 C.F.R. § 130.35(b)(7) provides:

 If the clinical or other experience reported to or otherwise obtained by the applicant has revealed any information concerning any side-effect, injury, toxicity, or sensitivity reaction, or any unexpected incidence or severity thereof which by kind, or incidence or severity is not fully disclosed in the labeling, whether or not determined to be attributable to the drug, this information shall be submitted as soon as the review reveals such facts. Such information shall include full reports of all available

information with respect to any deaths, apparently related to drug administration whether or not determined to be attributable to the drug. Any such information previously submitted for inclusion in the new drug application or antibiotic form 5 or 6 need not be resubmitted.

13. The record is unclear whether 21 U.S.C. § 333 was admitted; the jury did receive a copy of it. § 333 pertains to criminal penalties and fines only; it does not set forth any guidelines or standards.

14. Examples of provisions erroneously included were those found in: 21 C.F.R. § 314.6—.7; 21 C.F.R. 314.9; 21 U.S.C. 353 (1989);

15. These included 15 U.S.C.A. §§ 52–56 (1973 & 1993 Supp.).

McNeil had submitted false reports to the FDA.

Hawkins also attempted to elicit testimony from Dr. Golombos regarding whether information allegedly missing from the NDA would affect the FDA's evaluation of a drug. The court limited the scope of Dr. Golombos's testimony, saying:

> You may ask [Dr. Golombos] what a physician needs, you may ask him what physicians need in treating patients, what physicians need in doing research, what physicians need in evaluating applications for new drugs, but you may not ask him if the withholding of the drug biases the FDA. You may ask would it significantly impact upon the FDA's opinion or final outcome, but you may not ask him if it would bias them.

Dr. Golombos opined, based on his review of the NDA for chlorzoxazone and the clinical records of Dr. Drew, that all significant information necessary to determine the safety of the drug was not submitted by McNeil to the FDA.

Dr. Golombos characterized Dr. Drew's clinical study as a rechallenge,[16] and stated that "the Drew study raises serious questions regarding the effect of [chlorzoxazone] on the liver." Furthermore, Dr. Golombos opined that "the Drew study clearly indicates that the drug had a detrimental effect on the liver." Dr. Golombos also characterized the studies of Dr. Schiff and Dr. Bowers as positive rechallenges, and opined that McNeil's failure to disclose the three rechallenge tests would impair a physician's ability to exercise medical judgment. He further testified that McNeil had received the reports of the positive rechallenges prior to receiving a letter from Dr. Powers stating that "[r]eview of these records fails to demonstrate any reports with a positive rechallenge to the drug."

Dr. Golombos also addressed the Batterman study, of which he conducted his own statistical analysis. He stated that it was "unlikely that th[e] increase [in liver function] was a chance occurrence" and that the drug had a significant effect on the liver in producing an abnormal result. Moreover, he testified that the failure of McNeil to perform its own statistical analysis of the Batterman test results and to disseminate that information to the medical community would impair a physician's ability to exercise his or her independent medical judgment in deciding whether to prescribe the drug.

He further testified that a drug's reputation for safety in the medical community is primarily based on published information in the medical literature, on hearsay from colleagues who have had good or bad experiences with the drug, and from information given to physicians by the representative of the drug company. Finally, based on the information he reviewed, Dr. Golombos opined that physicians had received misleading information about the affects of chlorzoxazone on the liver.

Dr. Golombos was not permitted, however, to offer any opinion on the safety of drugs, testify whether the warning given by McNeil was adequate, or to characterize the conduct of McNeil. In sustaining McNeil's objection to each question touching on these issues, the trial court ruled that Dr. Golombos was not offered or qualified as an expert for those purposes, and he was "not an expert on drug evaluation nor [did] he work with the FDA." Furthermore, Dr. Golombos was not permitted to opine as to whether McNeil had breached its statutory or regulatory responsibilities. Hawkins does not challenge the trial court's rulings on these points in its appeal in this court.

Hawkins also called Dr. Bernard Powers, accepted as an expert in gastroenterology and internal medicine, who in 1984 conducted a rechallenge on one of his patients who had been prescribed chlorzoxazone. As a follow-up to his study, Dr. Powers located fifty-five reports of adverse reactions to chlorzoxazone, nineteen of which he received from the FDA as occurring before 1970, twenty-three of which occurred as of 1983,

16. A "rechallenge" is generally known as a study where a patient with an adverse reaction is taken off a drug for a period of time and then "rechallenged," or reexposed to it. If the same reaction reappear, the rechallenge is said to show a positive correlation between the adverse reaction and the drug.

and thirteen of which were reported in Sweden. Dr. Powers testified that McNeil's 1985 label for chlorzoxazone stated that "approximately 27 patients have been reported in whom the administration of . . . [chlorzoxazone] was suspected as being the cause of liver damage." He also testified that as of 1990, he located an additional fifteen reports of adverse reactions in Sweden, but the chlorzoxazone's label only reported approximately thirty-six patients with adverse reactions.

Dr. Powers testified that the chlorzoxazone label "has a lot of conflicting information within it," and that because it failed to disclose at least two known positive drug rechallenges, it neglects to inform the physician on a vitally important matter. Dr. Powers, however, was not accepted as an expert on labeling of pharmaceuticals, and thus did not offer an opinion concerning the label's sufficiency.

### b. Fact witnesses

Dr. Rusocoff, a retired physician who specialized in internal medicine and diseases of the chest, testified that one of his patients developed abnormal liver functions after taking chlorzoxazone, and that the patient's liver functions returned to normal when the drug was discontinued. In Dr. Rusocoff's opinion, it was "quite clear that [chlorzoxazone] had been the culprit and was responsible for creating [the] abnormalities of liver function." He reported the adverse reaction to McNeil in 1962. To establish that McNeil published false information on its labels, Dr. Rusocoff testified that his patient fit the profile of a patient described on chlorzoxazone's label. The label disclosed the patient's adverse reaction, but indicated that the patient had liver cancer. Dr. Rusocoff testified that his patient had prostate cancer, not liver cancer.

Plaintiff also called, as a fact witness, Dr. Arthur Burgerman, the physician who prescribed the drug to the decedent. A licensed physician who was board certified in internal medicine, Dr. Burgerman prescribed Parafon Forte DSC to Gilliam in an effort to relieve

numbness and stiffness she was experiencing in her arms. At trial, Dr. Burgerman testified that he first prescribed chlorzoxazone between 1968 and 1970, and at that time reviewed the drug's product labeling. Although Dr. Burgerman knew that reports of liver damage had been associated with chlorzoxazone, he did not think the drug caused liver damage, and he did not inform Gilliam that the drug had a possible association with liver damage or death.

Dr. Burgerman testified that he did not review McNeil's labeling again until sometime between Gilliam's death and the trial. In prescribing the drug during his years of practice, Dr. Burgerman stated that he "relied on a number of factors, primarily [his] own experience over many years, which had been good, plus discussions with other physicians, plus meetings [he went] to, articles [he] read, journals [he] read, [and] lectures [he] attend[ed]." Moreover, he testified that the drug's label, which he read twenty years earlier, was one of the factors that he relied upon in prescribing chlorzoxazone, as well as communications made to him by colleagues about the drug's risks and benefits. Finally, Dr. Burgerman testified that in prescribing the drug for Gilliam he "relied more on [his] own knowledge of the drug than [he] did on something that the drug company published."

Plaintiff attempted to elicit from Dr. Burgerman a response to the hypothetical question of whether, had he been aware that chlorzoxazone had the potential of causing massive liver damage to the extent of causing death, he would have prescribed the drug to Gilliam. The trial court sustained McNeil's objection to the question based on the ground that it was speculative. The court noted that Dr. Burgerman was "not proffered as an expert," having been designated pretrial as a treating physician and not as an expert witness. The trial court ruled that "[h]ypotheticals will not be accepted" from Dr. Burgerman, and denied Plaintiff's motion, made the next day, to recall Dr. Burgerman to testify on that point.[17]

---

17. While Hawkins generally complains of that ruling in her brief, she has not made a formal challenge, and we, therefore, do not consider it.

However, we note that this court addressed a similar issue in at least two previous cases. *See Adkins v. Morton*, 494 A.2d 652 (D.C.1985) (treat-

Plaintiff also presented the deposition testimony of Claudia A. White, Barry J. Cohen, Gary P. Horowitz, and Mr. Christopher Keeys. Gary Horowitz, Ph.D, McNeil's Senior Director of Affairs, testified about the results of Dr. Batterman's and Dr. Drew's studies. Mr. Keeys, President and co-founder of Clinical Pharmacy Associates, was qualified as an expert in "monitoring of drug information, including the collection, evaluation, dissemination of drug information." Mr. Keeys testified that based on his estimates, including the data from the Peak/Smith and Drew clinical studies, the total number of reported cases of toxic reaction to chlorzoxazone was actually one in 450,000 patients. The parties stipulated that the drug containing chlorzoxazone "ingested by Elva Mae Gilliam was unaltered and in the same condition as when it left the control of Defendant McNeil Pharmaceutical." Finally, Delores E. Hawkins, Gilliam's daughter, testified as to the circumstances of her mother's death.

### B. Defense evidence

McNeil's witnesses, Dr. James Goddard, former FDA Commissioner, and Dr. Carroll M. Leevy, who had served ten years as a consultant to the FDA on hepatoxcity drug studies, were qualified as experts in FDA regulations and their application to labeling.[18] Drs. Goddard and Leevy testified that McNeil's labeling was fully adequate to inform prescribing physicians about the risks and benefits of the drug. Dr. Goddard testified that McNeil was at all times in compliance with FDA regulations regarding chlorzoxazone and that its labeling for the product was fully adequate. He noted there was no regulatory requirement that positive rechallenges be identified in drug labeling. Dr. Leevy also testified that there was no need to include rechallenge information in the label.

ing doctor, who was not listed as a Rule 26(b)(4) expert, was eligible to testify about the reasons he had not ordered home nursing care and about his opinion as to why the patient would not need such care because it "comprised knowledge and views derived not in anticipation of litigation," but rather from course of treatment); *Abbey v. Jackson*, 483 A.2d 330 (D.C.1984) (treating physicians not experts within Super. Ct. Civ. R.

### III. Legal principles

In reviewing the denial of a motion for judgment as a matter of law, this court applies the same standard as the trial court, which decides whether it must "render the verdict mandated by law irrespective of the verdict issued by the jury." *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C. 1983) (per curiam); *see also Ceco Corp. v. Coleman*, 441 A.2d 940, 944 (D.C.1982). The trial court may resolve as a matter of law · factual issues only when "the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment." *Cassidy, supra*, 465 A.2d at 397 (quoting *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc)). Moreover, "where there is no basis in evidence for a finding of ... negligence, it is error to instruct on the subject and thereby submit to the jury an issue outside the evidence." *District of Columbia v. White*, 442 A.2d 159, 163 n. 9 (D.C.1982) (quoting *Montague v. Henderson*, 409 A.2d 627, 628–29 (D.C.1979); *see also Robinson v. Washington Internal Med. Assocs., P.C.*, 647 A.2d 1140, 1144–45 (D.C.1994) (requiring request for special verdict or general verdict with interrogatories to preserve issue in some circumstances).

### A. Negligence theories

As a general rule, the plaintiff in a negligence action bears the burden of proving "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *See Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988); *see also Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984) (citations omitted) (medical malpractice); *Jones v. Safeway Stores, Inc.*, 314 A.2d 459, 460 (D.C.1974). In the

26(b)(4), were allowed to testify because they "were participants in events leading to lawsuit," thus their expertise was not developed in anticipation of litigation).

**18.** Hawkins stipulated to Dr. Leevy's qualifications, including as an expert on liver disease and FDA evaluation.

present case, the plaintiff proceeded on theories of negligence *per se* and strict liability, which are slight variations on this general rule.

■ To prevail on a negligence *per se* theory, the plaintiff may, in certain circumstances and under specified conditions as discussed in Part B, rely on a statute or regulation as proof of the applicable standard of care. *See Ceco Corp., supra,* 441 A.2d at 945. Proof of "[an] unexplained violation of that standard renders the defendant negligent as a matter of law," *id.* (quoting *Richardson v. Gregory,* 108 U.S.App. D.C. 263, 266, 281 F.2d 626, 629 (1960)), so long as the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent. *See Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1277 (D.C.1987); *Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 674 (D.C.1983). If, however, the defendant puts forth evidence excusing the violation, the violation may be considered evidence of negligence rather than negligence *per se. See Zhou, supra,* 534 A.2d at 1274; *Ceco Corp., supra,* 441 A.2d at 945; *cf. Robinson v. District of Columbia,* 580 A.2d 1255, 1257 (D.C.1990) (violation may be excused if the defendant demonstrates that he did "everything a reasonable person would do" to avoid that violation).

■ To recover under a theory of strict liability, a plaintiff must show that the product entered the stream of commerce with a design or manufacturing defect rendering it unreasonably dangerous. *See East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113, 1118 (D.C.1990). In this context,

> strict liability recognizes that some products, even if perfectly designed and manufactured, cannot be made completely safe for their intended use. RESTATEMENT (SECOND) OF TORTS, § 402A cmt. j (1965). In such cases, the defect and unreasonable danger "is the failure to attach adequate warnings to a product that, as designed and manufactured, may in certain circumstances cause injury."

19. Assumption of the risk, however, bars recovery under either strict liability or negligence.

*East Penn Mfg. Co., supra,* 578 A.2d at 1118 (citation omitted). Because McNeil did provide warnings of some of the adverse effects of chlorzoxazone on the liver, the issue here is not a failure to warn, but rather the *adequacy* of the warning.

■ Under strict liability, the duty of a manufacturer of a product *known* to be potentially harmful is one of ordinary care. *Id.* at 1118; *Russell v. G.A.F. Corp.,* 422 A.2d 989, 991 (D.C.1980) (citing to RESTATEMENT (SECOND) OF TORTS, § 402A cmt. k (1965)). Indeed, we have noted that "a strict liability action for failure to warn is 'really nothing more than a ground of negligence liability described as the sale of a product in a defective condition, subject, however, to the defenses and other limitations on liability applicable to strict liability rather than negligence.'" *East Penn Mfg. Co., supra,* 578 A.2d at 1118 n. 5 (quoting W. KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS, § 99, at 697 (5th ed.1984)). In other words, negligence and strict liability, in failure to warn cases, are functional equivalents in that both condition liability on the defendant's having actually or constructively known of the risk that triggers the need for a warning. Thus, the principal benefit to a plaintiff proceeding under a strict liability theory in a failure to warn case is that a defendant cannot claim contributory negligence as a defense, a circumstance not applicable in this case. *See Payne v. Soft–Sheen Prod.,* 486 A.2d 712, 721 n. 9 (D.C.1985).[19]

■ In sum, under either the *per se* or strict liability theories, the plaintiff must establish the applicable standard of care, show that the defendant violated that standard, and that the violation was the proximate cause of the injury. The standard of care may be established by looking to the conduct of the industry or profession in similar circumstances—in this case a reasonable pharmaceutical company—or by looking to standards embodied in statutes or regulations. *See Zhou, supra,* 534 A.2d at 1273–74; *Ceco Corp., supra,* 441 A.2d at 945.

*See Payne, supra,* 486 A.2d at 721 n. 9; *East Penn, supra,* 578 A.2d at 1119.

Hawkins acknowledges that the only evidence of a standard of care presented to the jury was the standard established by the numerous federal statutes and regulations submitted to the jury. Indeed, a review of the trial transcript indicates that none of Hawkins's witnesses testified as to a standard of care. Thus, the threshold question is whether the statutes and regulations served as appropriate exclusive proof of the standard of care.

## B. Statutes and regulations as proof of standard of care

We first turn to an examination of the principles governing the admissibility of statutes and regulations offered to establish a standard of care for negligence *per se* purposes. While we do not decide, with the one exception noted below, whether the trial court properly admitted the statutes and regulations considered by the jury here, we do conclude that the trial court did not adequately examine the statutes and regulations to determine whether they established a standard of care and, if so, whether they could be understood by the jury without further guidance.

 The decision to adopt from a statute a standard of care to be applied in determining common law negligence is " 'purely a judicial one, for the court to make.' " *Zhou, supra,* 534 A.2d at 1274 (quoting RESTATEMENT (SECOND) OF TORTS § 286 cmt. d at 26 (1965)).[20] In fact, a court may decline to apply negligence *per se* to a particular case "if sufficient policy considerations militate against it." *White, supra,* 442 A.2d at 164. At a minimum, however, the statute or regulation relied on must promote public safety and have been "enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred." *Joy v. Bell Helicopter Textron, Inc.,* 303 U.S.App. D.C. 1, 9, 999 F.2d 549, 557 (1993) (applying District of Columbia law and citing *Ceco Corp., supra,* 441 A.2d at 945 (other

citations omitted)); *see also Zhou, supra,* 534 A.2d at 1273. The statute must also "impose specific duties on the defendant." *White, supra,* 442 A.2d at 164 (citation omitted).

 Moreover, a statute or regulation offered to establish a standard for negligence *per se* purposes must not merely repeat the common law duty of reasonable care, but must set forth "specific guidelines to govern behavior." *Joy, supra,* 303 U.S.App. D.C. at 10, 999 F.2d at 558; *see also, e.g., Thoma v. Kettler,* 632 A.2d 725, 728–29 n. 8 (D.C.1993) (noting that the generality of the regulation providing that "[d]ebris and other loose materials, shall not be allowed on or under stairways" and "[s]lippery conditions on stairways shall be eliminated as soon as possible" did not differ significantly in particulars from the common law standard of reasonable care in the circumstances); *District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987) (violation of statute requiring Department of Corrections to be "responsible for the safekeeping, care, protection, instruction, and discipline" of inmates implicitly recognized the common law duty of reasonable care and contained no specifics that could give rise to claim of negligence *per se* ); *Lewis, supra,* 463 A.2d at 674 (holding that negligence *per se* instruction was not warranted where plaintiffs alleged violation in building code provision requiring neighboring property and structures be "sufficiently supported").

McNeil argues that the trial court erred in admitting the statutes and regulations received here. In particular, McNeil contends that the trial court failed to make the threshold determination that the statutes were applicable, arguing that the statutes were too complex, vague, and subject to differing interpretations to be understood and applied by a lay juror.

 Hawkins responds that the trial court correctly ruled that the statutes and regulations were admissible,[21] contending

---

20. "Defining the contours of common law liability, including the duty that may have been breached in a negligence case, is a task traditionally within the purview of the judicial branch." *Zhou, supra,* 534 A.2d at 1274 (citations omitted).

21. Hawkins also contends that McNeil waived this argument by failing to object to the admission of specific parts of the statutes as too complex for negligence *per se* purposes and did not object to providing the jury with copies of the

that the case law does not support McNeil's contention that the statutes were too complex for negligence *per se* purposes. Moreover, as counsel acknowledged at oral argument, Hawkins relies on the plain meaning of the statutes, arguing that she was not required to offer expert testimony to explain their meaning. In support of that argument, Hawkins cites several cases in which FDA regulations were admitted to establish the standard of care. We think that Hawkins's reliance on those cases is misplaced because in each case cited, unlike the circumstances presented here, the violation at issue was clear and uncomplicated, and involved only a small number of readily understandable statutes. *See Stanton by Brooks v. Astra Pharm. Prod., Inc.,* 718 F.2d 553, 560 (3d Cir.1983) (pharmaceutical company failed altogether to submit NDA for a new drug and failed to forward any of more than 200 adverse reactions to the FDA); *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132 (3d Cir. 1973) (company advertised a change in the market use of drug but failed altogether to submit NDA for the new purpose as required by the FDA); *Orthopedic Equip. Co. v. Eutsler,* 276 F.2d 455 (4th Cir.1960) (incorrect diameter stated on surgical nail label could be negligence *per se* under FDA statute prohibiting "misbranding," where nail became stuck in plaintiff's leg); *Toole v. Richardson–Merrell, Inc.,* 251 Cal.App.2d 689, 60 Cal. Rptr. 398 (1967) (company filed NDA, reporting 50% death rates in animal testing when 100% had died, and included wholly fictitious data).

■ Our review of the statutes and regulations admitted here raises questions on whether they can be used to establish a standard of care for negligence *per se* purposes in the absence of adequate examina-

tion by the trial court to determine whether they were applicable and whether they could be understood by the jury without guidance from the court or expert testimony concerning their meaning. The court admitted dozens of statutes and regulations, some possibly applicable in the determination of a standard of care and at least one clearly not. For example, while McNeil does not contest that the FD & C Act and FDA regulations are safety statutes, we agree with its contention that the criminal statute prohibiting false statements to the government, 18 U.S.C. § 1001 (1958), which was also admitted by the trial court, was not intended to promote public safety and has no bearing on the issues presented here. *See Hubbard v. United States,* — U.S. —, —, 115 S.Ct. 1754, 1761, 131 L.Ed.2d 779 (1995) (18 U.S.C. § 1001 "was passed at the behest of 'the Secretary of the Interior to aid the enforcement of laws relating to ... transportation of hot oil' "). Hawkins made no attempt to justify the use of 18 U.S.C. § 1001, or 15 U.S.C.A. § 51–57 (1973 & 1993 Supp.) (prohibiting false advertisements), as applicable under negligence *per se* principles.

■ We have implied in prior holdings that many complex or technical statutes, such as those at issue here, may not be used for negligence *per se* purposes without expert testimony or guidance from the court to assist the jury's understanding. *See, e.g., Lewis, supra* note 21, 463 A.2d at 674. In that regard we note that in reviewing these cases where the negligence *per se* principle was accepted, the general subject matter of the cases involve principles familiar to lay jurors' everyday lives. For example, it can hardly be said that any juror would be confused by

statutes. However, the record indicates that McNeil entered effective objections, including its "continuing objection" to the statutes serving as definitions of the standard of care. See Part II, A. (3). McNeil's objections clearly " 'called to the attention of the trial court ... the question of law involved.' " *Ceco Corp., supra,* 441 A.2d at 947 (citations omitted). Furthermore, even if McNeil did not continue to phrase its objection in the same manner each time, its failure to repeat every part of its objection "may be disregarded if the party's position has previously been clearly made to the court and it is plain that a

further objection would be unavailing." 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2553, at 411 (2nd ed.1994) (commenting on Rule 51 of the Federal Rules of Civil Procedure, which is identical to Super. Ct. Civ. R. 51); *cf. Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 672–73 n. 14 (D.C.1983) ("unduly harsh to penalize appellants" under Rule 51 "for their imperfectly timed request," where the trial judge had adequate opportunity to consider and act upon the request).

a statute requiring a home to be "in repair," *see Whetzel v. Jess Fisher Management Co.,* 108 U.S.App. D.C. 385, 392, 282 F.2d 943, 950 (1960) (housing code violation allegedly caused falling ceiling to injure tenant), or one requiring a temporary cover of a floor opening at a construction site to be "securely fastened in place" to withstand reasonable weight or shock. *See H.R.H. Constr. Co. v. Conroy,* 134 U.S.App. D.C. 7, 411 F.2d 722 (1969) (safety code violated by temporary cover over air-conditioning duct; worker injured when he stepped on loose board covering duct that was three inches smaller than opening itself); *see also Elliott v. Michael James, Inc.,* 182 U.S.App. D.C. 138, 559 F.2d 759 (1977) (building code violated where doors were unlawfully locked on inside; restaurant employee unable to escape assailant and was fatally stabbed). Most adults are familiar with automobiles and the rules of driving, therefore, experts are not needed to explain the meaning of statutes and regulations governing such everyday experiences. *See Ross v. Hartman,* 78 U.S.App. D.C. 217, 139 F.2d 14 (1943) (violation of ordinance requiring motor vehicles to be locked was negligence *per se* in action by party injured by the stolen vehicle); *see also Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973) (traffic regulations); *District of Columbia v. Nordstrom,* 117 U.S.App. D.C. 165, 327 F.2d 863 (1963) (traffic regulation prohibiting parking of vehicles on sidewalk could be submitted as applicable standard of care where pedestrian was injured trying to avoid the unlawfully parked vehicle). Similarly, jurors are generally familiar with how drinks are sold in a tavern, *see Zhou, supra,* 534 A.2d 1268 (Alcohol Beverage Control Act), and can understand the danger of lighting a match in an area "heavily permeated with the smell of gas fumes." *Gaither v. District of Columbia,* 333 A.2d 57, 60 (D.C.1975) (D.C.Code 1973, § 24–442). The same cannot be said of the statutes and regulations admitted in this case.

■ Before admitting statutes and regulations offered for negligence *per se* purposes, a trial judge must examine each law to determine first, whether it in fact established a standard of care, and if so, whether it could be reasonably understood by the jury without expert testimony or guidance by the court.[22] *See Lewis, supra,* 463 A.2d at 674; *see also Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 900 (7th Cir. 1994) (trial judge made "serious mistake" by leaving jury to interpret meaning of ambiguous motor vehicle safety standards). Particularly instructive on this point is *Lewis,* where the owners of a building sued a subway construction company, alleging the company negligently failed to maintain adequate support for the building during the subway excavation. The trial court admitted into evidence two provisions of the building code as evidence of negligence, but, citing its doubt about the regulations' applicability to the case, refused the owners' request for a negligence *per se* instruction. On appeal, we concluded that the trial court did not err in declining the negligence *per se* instruction. We noted the failure of the plaintiff-owners to "proffer any evidence regarding the purpose and scope of the two building code sections or the meaning of the key terms in them." *Lewis, supra,* 463 A.2d at 674. We also noted that the owners failed to make a threshold showing that the statutes were applicable and presented insufficient evidence that the regulations were, in fact, violated. *Id. See also Hecht Co. v. McLaughlin,* 93 U.S.App. D.C. 382, 385, 214 F.2d 212, 215 (1954) (court should consider proffered expert testimony on the admissibility question where the scope of the statute is unclear); *Northern Trust Co. v. Upjohn Co.,* 213 Ill. App.3d 390, 157 Ill.Dec. 566, 576, 572 N.E.2d 1030, 1040 (1991) (FD & C Act misbranding statute that required listing of side effects

**22.** Although we do not reach the question whether it was appropriate for the trial court to submit copies of the statutes and annotations to the jury, we note that other courts have found that practice to be improper. *See Domijan v. Harp,* 340 S.W.2d 728, 734 (Mo.1960) (introduction into evidence of domestic statutes (or law) is wholly improper for damage calculations); *Saffold v.*

*McGraw–Edison Co.,* 566 F.2d 621, 623 (8th Cir. 1977) (in products liability action, "the proper procedure would have been for the trial court to judicially notice the statutes, instruct the jury as to their applicability and prohibit the reading of the statutes or reference to their criminal aspects").

was admitted for jury consideration; whether defendant was obligated to include cardiac arrest as a possible side effect on drug label was a complex question which required expert testimony).

For the reasons stated, we conclude that the trial court erred by not conducting an inquiry into whether *each* statute and regulation was appropriate to serve as an intelligible standard of care for negligence *per se* purposes.[23] That error would not, by itself, require reversal, however, if, upon our own examination, we concluded that the statutes and regulations were properly admitted without the need for further guidance by the trial court or expert testimony. We need not make that determination in this case because we conclude, for the reasons stated below, that the judgment must be reversed for another reason. Even though the statutes in question should not have been admitted as exclusive proof of the standard of care for the reasons stated, without more careful screening by the trial judge, the statutes nonetheless were admitted and were available to the jury to consider either as establishing or as evidence of the standard of care. *See Zhou, supra,* 534 A.2d at 1274 (statutory violation may be admitted as evidence of negligence even though the court does not find it appropriate for negligence *per se* ) (citations omitted). We now turn to our analysis of whether Hawkins established a breach of the standard of care.

## C. Proof of breach of standard of care

 McNeil further contends that, at the very least, the jury should have been guided, either by the trial court or through expert testimony, in its application of the statutes. Where the statutes and regulations are admitted as the basis for a finding of negligence *per se,* or as evidence of negligence, the plaintiff must also prove a deviation from the standard of care, *i.e.,* that the statutes were in fact violated. *See, e.g., Zhou, supra,* 534 A.2d at 1277 (jury "must surmount the threshold question" of whether, in fact, the statute has been violated); *Stevens v. Hall,* 391 A.2d 792, 796 n. 2 (D.C.1978) (even where *per se* rule is applicable, "jury may have a difficult threshold question as to whether, in fact, the relevant statute or regulation has been violated").[24]

 The trier of fact is sometimes confronted with issues that require scientific or specialized knowledge or experience in order to be properly understood, and which cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life. *See District of Columbia v. Hampton,* 666 A.2d 30, 35 (D.C.1995); *Payne, supra,* 486 A.2d at 727 & n. 17; *see also* 31A AM. JUR. 2D, *Expert and Opinion Evidence* § 5 (1989). On such issues, the general rule in the District of Columbia is that testimony of one possessing special knowledge or skill is required in order to arrive at an intelligent conclusion. *Hampton, supra,* 666 A.2d at 35 (referring to professional medical malpractice cases). In a "substantially smaller number of cases," however, the plaintiff is not required to adduce expert testimony to establish the applicable

---

**23.** Alaska state courts have established a two-step inquiry for trial courts to follow when asked to instruct a jury that violation of a statute or ordinance establishes negligence as a matter of law. *See State Mechanical, Inc. v. Liquid Air, Inc.,* 665 P.2d 15, 18–19 (Alaska 1983); *see also Sinclair v. Okata,* 874 F.Supp. 1051, 1062–63 (D.Alaska 1994) (adopted A.M.C. § 17.10.020(A) (1986) as standard of care for dog and cat owners; statute provides that "[a] person who owns a dog or a cat shall keep that animal under restraint at all times"); *Ferrell v. Baxter,* 484 P.2d 250, 264–65 (Alaska 1971). First, the court applies the four criteria outlined in the Restatement (Second) of Torts § 286, to determine whether the statute or ordinance was designed to cover the conduct in question. If the court decides the first inquiry in the affirmative, it then considers whether the rule of law is so obscure, outdated, or arbitrary as to make inequitable its adoption as a standard of reasonable care. *Id.*

If the Alaskan court declines, for either reason, to instruct the jury that a violation of the statute establishes negligence *per se,* it may, in its discretion, either admit the statute or ordinance as evidence of negligence or it may exclude reference to the statute altogether. *Sinclair, supra,* 874 F.Supp. at 1062.

**24.** "In addition, plaintiffs must prove that the statutory violation was the proximate cause of their injuries." *Zhou, supra,* 534 A.2d at 1277. Although McNeil claims such proof was lacking here, we need not address that issue.

standard of care where "negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience." *Id.; Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 200 (D.C.1991) (citations omitted); *see also White, supra,* 442 A.2d at 164 (expert testimony to prove a deviation from the proper standard of care is required "when the subject presented is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman'") (quoting *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981)). In *Hampton,* this court noted that "[t]he general rule is most commonly applied ... in professional malpractice cases ... [but] the requirement has been applied more broadly in a variety of situations." *Hampton, supra,* 666 A.2d at 35 (citations omitted). Thus, had Hawkins presented proof of the standard of care, and its breach, through traditional negligence analysis, she would most certainly have been required to present that proof through expert testimony.

In addition, this jurisdiction has required expert testimony to explain the applicability of statutes where the statute is relied upon as establishing the standard of care. In *Hecht Co. v. McLaughlin, supra,* 93 U.S.App. D.C. at 382, 214 F.2d at 212, where the plaintiff was injured by a "modern" door, "not the ordinary type," on the defendant department store's property, the trial court instructed the jury that the violation of a building code regulation would be negligence as a matter of law, but rejected the testimony of a liaison officer of the District of Columbia Building Department that the regulation did not apply to the situation before the court. The United States Court of Appeals for the District of Columbia Circuit, in an opinion binding on us,[25] reversed, noting that

the installation of the door had been approved by the Department of Building Inspection, and holding that the trial court's "failure to receive expert testimony as to the interpretation, and consequent admissibility and application, of the regulation, and the instruction that its violation would constitute negligence *per se* require[d] reversal."[26] *Id.,* 93 U.S.App. D.C. at 386, 214 F.2d at 216. In so holding, the court cited *Wright v. Wardman,* 55 App. D.C. 318, 319, 5 F.2d 380, 381 (1925) (dubiously worded zoning regulation) which held that where there is uncertainty about the meaning of a "statute, ordinance, or regulation," the expert or administrative view will generally control its interpretation. *Wright, supra,* 55 App. D.C. at 319, 5 F.2d at 381.

In this case, for the reasons stated below, in the face of defense experts who testified that there was no breach of the standard of care, and statutes and regulations which required expert explication, we hold that Hawkins was required to present expert testimony concerning the interpretation of the statutes and regulations relied upon by her, so that the jury would be guided in its application of those sources to the conduct at issue in this case. The jury then would have been able to determine whether McNeil deviated from the proper standard of care, *i.e.,* whether McNeil's conduct violated the statutes and regulations.[27]

We are persuaded to that view by the well-reasoned opinion of the court in *Northern Trust Co. v. Upjohn Co.,* 213 Ill.App.3d 390, 157 Ill.Dec. 566, 576, 572 N.E.2d 1030, 1040 (1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). In that case, the plaintiff suffered a cardiac arrest and sustained brain injury after a doctor administered the drug Prostiglandin F2 Alpha ("Prostin"), manufactured by the Upjohn

---

**25.** *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

**26.** In the present case, Hawkins did not offer any such testimony.

**27.** Other jurisdictions have indicated that expert testimony should be considered to determine whether a warning is adequate in non-negligent *per se* situations. In *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483 (D.Kan.1987) (not a negligence *per se* case), the court stated, "It is well established in Kansas that whether a warning is adequate is an issue for the trier of fact. Moreover, the testimony of experts in the field should be considered." *Id.* at 1499 (internal citations omitted); *see also Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831, 841–42 (1981) (expert witness could respond to hypothetical question whether defendant doctor "deviated in any way from the acceptable standards of practice").

Company. Northern Trust Company, as guardian of plaintiff's estate, sued Upjohn for negligent failure to warn and for product liability, contending that although Upjohn was aware of at least nine instances where cardiac arrest and/or death occurred after Prostin was administered, the label on the drug did not list cardiac arrest as a possible side effect. The jury was instructed that it could consider whether Upjohn violated any statute, regulation, or ordinance in deciding whether it was negligent and/or manufactured an unreasonably dangerous product.[28] The jury returned a verdict for the plaintiff for over $9 million.[29] On appeal, however, the Appellate Court of Illinois reversed the judgment.

The *Upjohn* court first held that, "by logical extension" to the requirement of expert testimony in medical malpractice cases, "expert testimony shall be necessary and proper in a case, ... where a drug manufacturer's liability for a prescription drug is based upon its failure to provide adequate warnings," except where the inadequacy of the warning is so obvious that a lay person could understand its insufficiency. *Id.*, 157 Ill.Dec. at 572, 572 N.E.2d at 1036. The court then went on to address whether, under the facts presented to it, expert testimony was required.

The court ultimately concluded that expert testimony was required to establish both (1) the "complex question" of Upjohn's duty to warn of reported cases of cardiac arrest, *i.e.*, that knowledge of those cases was tantamount to knowledge of an "association" between the drug and cardiac arrest,[30] and (2) that Upjohn abrogated its duty, *i.e.*, that the label was inadequate to warn physicians of the potential dangers inherent in the use of the drug. *Id.* at 573–74, 572 N.E.2d at 1037–38. In so holding, the court reasoned that "it seems clear that the meaning and medical implications of several of the listed adverse reactions is outside the knowledge of the ordinary lay person," *id.* at 575, 572 N.E.2d at 1039, and a lay person "would be unable to determine, for example, whether a drug was 'misbranded' [as defined by the statute] unless expert testimony was provided."[31] *Id.* at 576, 572 N.E.2d at 1040.

In this case the trial court admitted dozens of statutes and regulations. Our examination satisfies us that, with three possible exceptions, all involve use of generalized language which would require expert testimony to explain to jurors how McNeil violated them. One of the remaining three, 18 U.S.C. § 1001, is clearly not applicable, as we said earlier. The last two statutes at first seem capable of lay application. However, though parts of 15 U.S.C.A. §§ 51–57 (1973 & 1993 Supp.) (prohibiting false advertisements) seem straightforward, the definitional section, § 55, is quite intricate and may involve complicated implementing regulations. Likewise, 21 U.S.C. § 352 (1958) appears straightforward on its face. But lay jurors may not understand, since it is not apparent on the face of the statute, that the statute is supplemented in great detail by the regulations of 21 C.F.R. §§ 201.1–201.316 (1990). Although these regulations were submitted

28. The statutes and regulations involved in *Upjohn* were similar to those presented in this case, although considerably fewer in number. The trial court in *Upjohn* quoted in pertinent part the following statute and regulations in its instruction to the jury: 21 U.S.C. § 352(a), (f), (j), and (n) ("Misbranded drugs and devices"; drug misbranded if its labeling was found to be false or misleading); 21 C.F.R. §§ 1.3(a)(1), (2); 314.8(a), (b), (d), (e) and (*l*) (labeling of drug misleading if it failed to reveal facts that were "material in light of other representations made;" changes in labeling, advertising or warnings concerning a drug's side effects should be "placed into effect at the earliest possible time.") *Upjohn, supra,* 157 Ill.Dec. at 572–73, 572 N.E.2d at 1036–37.

29. The verdict was against all defendants, Upjohn, the administering doctor and the hospital, jointly and severally.

30. The court concluded that "the link between Prostin and cardiac arrest was not so apparent that expert testimony was not necessary to establish that a duty was imposed upon Upjohn to include cardiac arrest in the warnings." *Upjohn, supra,* 157 Ill.Dec. at 574, 572 N.E.2d at 1038.

31. "The typical juror would be unqualified to determine, without the aid of expert testimony, whether the failure to include "cardiac arrest" was a "material misrepresentation," as defined by the statute, which made the warnings false, misleading or inadequate to direct the drug's usage." *Id.* at 576, 572 N.E.2d at 1040.

to the jury, lay jurors would be unable to assess how the regulations affect interpretation of the statute without expert testimony to help them apply the appropriate standard of care.

■■■ A review of the testimony in this case reveals that Hawkins presented no competent expert testimony regarding the violation of the statutes and regulations submitted to the jury. While Hawkins attempted to elicit testimony regarding violations of the regulations from its "expert" witnesses, she was not allowed to do so because her medical experts lacked expertise in assessing submissions to the FDA, and they were not allowed to answer questions incorporating the terms of the regulatory requirements. In contrast, McNeil's experts were qualified to testify that McNeil's labeling was fully adequate to inform physicians about the risks and benefits of the drug, that McNeil was at all times in compliance with FDA regulations regarding chlorzoxazone, and that its labeling for the product was fully adequate. They also testified that there was no need to include rechallenge information in the label for chlorzoxazone, and that there is no regulatory requirement that positive rechallenges be described in drug labeling.

Hawkins maintains that she presented numerous expert witnesses to establish that McNeil's labeling was inadequate, and thus, that McNeil violated the standard of care. In particular, Hawkins cites the testimony of Dr. Golombos, qualified as an expert in the disease of the liver, who testified, *inter alia,* that based on his review of the NDA and the clinical records of Dr. Drew, all significant information necessary to determine the safety of the drug was not submitted by McNeil to the FDA. The trial court, however, precluded Dr. Golombos from testifying whether the information allegedly withheld by McNeil from the FDA would affect the FDA's approval or constitute a violation of the statutes. Dr. Golombos had not been qualified

to opine whether McNeil had breached its statutory or regulatory responsibilities. The trial court explained:

Why was he [Dr. Golombos] foreclosed from testifying about the Food and Drug Administration [a]nd their requirements? [B]ecause each time that the preliminary foundational question of knowledge came up, he was lacking in it, never having worked for the FDA and been in a position to assess, evaluate and pass on the Food and Drug Administration standards.

The expert testimony presented by Hawkins may have been sufficient had Hawkins presented traditional evidence of the standard of care,[32] where the label must merely be proven to be unreasonable under the circumstances. *See, e.g., Payne, supra,* 486 A.2d at 722 n. 10 (in negligent failure to warn case, absence of proper warning can range from complete absence of any warning to warning which is given but is inadequate; test of propriety has been expressed as whether the warnings given are "reasonable under the circumstances"). In this case, however, the only evidence of a standard of care offered by Hawkins was that embodied in the statutes and regulations. Therefore, in order to prove her case, it was incumbent on Hawkins to prove a violation of those statutes and regulations. And, in order to do that, Hawkins was required to present an expert who was familiar with the application of the statutes and regulations. *See Snead v. United States,* 595 F.Supp. 658, 663 (D.D.C. 1984) (to give opinion on whether defendant physician complied with applicable standard of care, witness physician must be familiar with that standard).[33] She did not do so, therefore she did not present to the jury any evidence that McNeil violated the only standard of care offered, *i.e.,* the statutes and regulations.

## IV. Conclusion

We reverse on the negligence *per se* claim because Hawkins did not present sufficient

---

**32.** This is also true of Hawkins's argument that whether a violation occurred is a question of fact for the jury. As we have explained above, the statutes and regulations were not within the realm of common knowledge, therefore the jury needed guidance from someone with special knowledge of their application.

**33.** *See Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1112–13 (5th Cir.1991) (fact that expert has a medical degree does not qualify him to give opinion on every conceivable medical question).

evidence of the standard of care, or that any such standard had been violated. We also hold that because Hawkins failed to adequately establish a standard of care or a deviation from that standard, she also failed to satisfy the element of proof under § 402A of the Restatement (Second) of Torts, or a "defective condition unreasonably dangerous," required for her strict liability claim. *See Warner Fruehauf Trailer Co. v. Boston,* 654 A.2d 1272, 1276 (D.C.1995) (plaintiff must establish that defendant sold product in question in a "defective and unreasonably dangerous condition"). Accordingly, judgment as a matter of law should have been entered in favor of McNeil on both Hawkins's negligence *per se* and strict liability claims.[34]

For all of these reasons the judgments in favor of Hawkins must be reversed and remanded with instructions to enter judgment for McNeil.

*Reversed.*

---

**34.** McNeil contended that Hawkins failed to show a causal connection between the alleged violations and the injury. Specifically, McNeil argued that Dr. Burgerman, who prescribed the drug to the deceased, testified that he did not read or rely on the allegedly inadequate label, and there was no testimony as to how Dr. Burgerman would have acted had he read the label. In *Mampe v. Ayerst Laboratories*, 548 A.2d 798 (D.C.1988), on facts similar to the present case, we held that proximate cause had not been proven where there was unrebutted evidence that, regardless of whether the doctor read the allegedly inadequate warning label, the information contained in the label would have had no effect on his decision to prescribe the drug. *Id.* at 802. Because we resolve this case on other grounds, we do not address the issue of proximate causation.